UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

<u>Theresa Wamala</u>

    v.                               Civil No. 09-cv-304-JD
                                     Opinion No. 2010 DNH 195

<u>City of Nashua, et al.</u>

O R D E R

Theresa Wamala, proceeding pro se, brings civil rights
claims against the City of Nashua, the mayor, the present and
former chiefs of police, and several police officers, arising
from events following a family disturbance in the Wamalas' home
in September of 2006.  The defendants move for summary judgment
on Theresa Wamala's claims, except her claims under the Fourth
and Fourteenth Amendments against defendant Michael Moushegian.
Theresa Wamala objects to summary judgment.

Standard of Review

Summary judgment is appropriate when the moving party
demonstrates "the pleadings, the discovery and disclosure
materials on file, and any affidavits show that there is no
genuine issue as to any material fact and that the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(c)(2).  When a party moving for summary does not bear the

burden of proof on the challenged claims, that party may succeed either by pointing out that the plaintiff lacks evidence to support her case or by showing that based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-25 (1986); Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002). To avoid summary judgment, the nonmoving party must provide sufficient properly supported facts to demonstrate that based on the applicable legal principles a reasonable jury could find in her favor. Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 241 (1st Cir. 2006). All reasonable inferences from the properly supported record will be resolved in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).


## Background

In September of 2006, Theresa Wamala was twenty-three years old and lived in an apartment in Nashua, New Hampshire, with her father, Severine Wamala, and her siblings, Lwiza, Jessica, and Jacob. Theresa was attending college at the University of Massachusetts at Lowell.[1]

---

[1]The court will refer to the plaintiff, Theresa Wamala, as Theresa to avoid confusion with other members of her family.

A disturbance arose among the family members during the evening of September 11, 2006, while Theresa was not at home. The police were called but left soon after they arrived.  The problems continued after Theresa returned home and escalated to the point that Jessica, who was fifteen years old, threatened their father with a knife.  Severine, their father, instructed Theresa to call the police, which she did.

Nashua police officers Scott Ciszek and Lisa Nadworny responded to the call and went to the Wamalas' apartment.  While Jessica was in her bedroom with Officer Nadworny, Jessica told Nadworny that her father had been raping her over an extended period of time and that some of the assaults took place in the apartment.  Jessica's brother, Jacob, told Ciszek that Jessica had told him the same thing and gave Ciszek a school project Jessica had prepared, a "time capsule," which also revealed that Severine had raped Jessica.[2]

Nadworny took Jessica and Jacob to the police station to be interviewed.  A few minutes later, Lwiza was also taken to the police station.  Ciszek stayed in the apartment with Theresa and Severine to secure the scene during the investigation into

---

[2]Although Theresa alleges in her objection that Jacob was surprised by Jessica's accusations against their father, Theresa provides no record support for her contention.  Therefore, she has not shown a factual dispute for purposes of summary judgment.

3

Jessica's accusations against her father.  At 1:00 am, Ciszek was notified that Jessica had made further statements and had identified her father's bedroom as one of the locations where the assaults occurred.  Two other officers arrived and took Severine to the police station to be interviewed.

Ciszek remained at the apartment until 7:30 the next morning, September 12, to ensure that Severine's bedroom was not touched during the ongoing investigation.  While he waited in the apartment, Ciszek spoke with Theresa on a variety of topics, including her schooling.  Ciszek states that he never told Theresa that she could not leave and that she never asked to leave the apartment.  Theresa states that she repeatedly asked Ciszek to leave and that he told her he could not leave until allowed to do so by his supervisors.  Theresa further states that she felt she was being held prisoner in her apartment.  At 7:30 on the next morning, Theresa left the apartment to go to school.[3]

While she was at school, Detective Michael Moushegain called Theresa and asked her to come to the police station.  Theresa states that Moushegian's tone was "demanding".  She arrived at

---

[3]Although Theresa states that she "sneaked out," she acknowledges that Ciszek was right beside the door when she left and that he did not try to stop her from leaving.  Therefore, the record does not support Theresa's allegation that she "sneaked out."

the station at about 10:00 a.m.  After a few minutes, Moushegian took her to an interview room, which Theresa describes as being very small and full of cameras.  Theresa states that she denied that her father had had any sexual contact with her and that after about fifteen minutes of calm question, Moushegian yelled at her, banged on the table, leaned in close to her face, and repeatedly asked her the same question about sexual activity with her father.

Theresa states that she asked to leave to go to a doctor's appointment and then to go back to school.  She contends that Moushegian kept telling her that she had to talk and told her she could not leave until Theresa told Moushegian "it happened." Theresa states that she was scared to death and that the questioning lasted for about an hour.  Theresa said that after that, Moushegian told her that her sister had been kept at the police station for over ten hours because she refused to say that she had had sex with their father, and Moushegian asked Theresa if she wanted to stay that long.  Theresa further states that Moushegian told her that if she wanted to leave she would have to tell him that she had had sex with her father.

Theresa states that "[o]ut of fear, intimidation, I was forced to say 'it happened' because I believed that, saying so was the only ticket for me to leave the police station."  She

5

also states that Moushegian told her she had to answer his "exact questions and you have to say you had sex with your father on tape." Theresa states that Moushegian "provided scenarios of situations which involved touching and having sex with [her] father." She contends that she continued to deny that she ever engaged in any sexual activity with her father and that Moushegian knew her recorded statements were false. She asserts that her recorded statements were false and that she made the statements only to avoid being kept at the police station indefinitely.

After the statements were recorded, Theresa asked to leave, and Moushegian told her that they were not finished and that she had to provide a DNA sample before she could leave. Theresa states that she signed the consent form against her will and provided a DNA sample in order to leave. Moushegian then took Theresa to another room and left her there. Theresa did not see Moushegian again that day. She contends that other unnamed officers asked her annoying questions, did not give her anything to eat, and would not let her leave. She states that she left the Nashua police station at about 9 p.m. Because of her stay at the police station, Theresa contends that she missed classes, a doctor's appointment, and work.

6

Theresa contends that Moushegian gave her statement about
sexual activity with her father to his supervisor, Scott Howe.
She further alleges that Moushegian and Howe provided the
statement to the media and to the Hillsborough County
Prosecutor's office.  She contends that her statement is widely
circulated on the internet.

Severine Wamala was tried and convicted on charges of
sexually abusing Theresa's sister, Jessica.  During the trial,
both Theresa and Lwiza testified that their father had had no
sexual contact with them.  Their trial testimony was impeached by
the recorded statements each of them had made in which they
recounted sexual assaults by their father.

The defendants explain that Timothy Hefferan was the chief
of the Nashua Police Department in September of 2006, when the
events involving the Wamalas occurred.[4]  Because the police
department is an independent subdivision of the City of Nashua,
the mayor does not have supervisory authority over the police.
The police department had standard operating procedures
concerning protection of a crime scene and interviewing witnesses
and victims of crimes.  The defendant officers in this case were
trained in the standard operating procedures.  The supervisors

---

[4]Theresa has also listed Chief Donald Conley and Mayor
Bernard Streeter as defendants.

offer their opinions that Moushegian, Ciszek, and Howe did not violate the standard operating procedures in the manner in which they handled the Wamalas and the apartment.   In addition, the supervisors state that they were never aware of any of the alleged misconduct while it was taking place.

### Discussion

Theresa Wamala brings twelve claims against Nashua; its mayor, Bernard Streeter; the present and former chiefs of the Nashua Police Department, Donald Conley and Timothy Hefferan; police supervisors, Scott Howe, Richard Sprankle, Frank Bourgeois, Kurt Gautier, Michael Ledoux, and Raymond McDannell; Detective Michael Moushegian; and Officer Scott Ciszek.[5]   She alleges violations of her First, Fourth, Fifth, and Fourteenth Amendment rights.   The defendants all move for summary judgment on Counts II through VIII and X through XII.   The supervisory and municipal defendants also move for summary judgment on Counts I and IX.[6]   Mayor Streeter and Chief Conley move for summary

---

[5]In her objection to summary judgment, Theresa concedes that Chief Conley is entitled to summary judgment because he was not the chief at the time of the events at issue in this case.

[6]Moushegian does not move for summary judgment on the claims against him in Counts I and IX.   Theresa mistakenly interprets the defendants' motion as an admission that Moushegian is liable in Counts I and IX.   That is not the case.   Moushegian disputes

judgment on the additional ground that no facts are alleged to support the claims against them.  Theresa objects to the motion for summary judgment.  The defendants seek summary judgment in favor of the city and supervisory defendants on Counts I and IX, and all defendants on Counts II through VIII and X through XII. Alternatively, the defendants seek summary judgment in favor of Mayor Streeter on the additional ground that Theresa has not alleged and cannot provide evidence to support her claims against him.

A.  Counts I and IX - Illegal Search and Seizure,  Municipal and Supervisory Liability

In Count I, Theresa contends that Moushegian violated her Fourth Amendment right to be free from unreasonable seizures by detaining her at the Nashua Police Department on September 12, 2006.  In Count IX, Theresa contends that Moushegian violated her Fourth Amendment right to be free from unreasonable searches by forcing her to provide a DNA sample.  She contends that the City of Nashua, Chief Hefferan, Mayor Streeter, Scott Howe, Richard Sprankle, Frank Bourgeois, Kurt Gautier, Michael Ledoux, and Raymond McDannell are liable for the alleged unreasonable search

_____

his liability but has not moved for summary judgment on those claims.

and seizure.  The municipal and supervisory defendants move for
summary judgment in their favor.

Municipal and supervisory liability for constitutional
violations, actionable under 42 U.S.C. § 1983, cannot be based on
a theory of vicarious liability.  <u>Ashcroft v. Iqbal</u>, 129 S. Ct.
1937, 1948 (2009); <u>Monell v. Dep't of Social Servs. of New York</u>,
436 U.S. 658, 691 (1978).  Municipalities are liable "only for
underlying, identifiable constitutional violations attributable
to official municipal policy; the municipality's failure to train
or supervise its police officers only becomes a basis for
liability when 'action pursuant to official municipal policy of
some nature <u>caused a constitutional tort</u>.'"  <u>Kennedy v. Town of
Billerica</u>, 617 F.3d 520, 532 (1st Cir. 2010)(quoting <u>Monell</u>, 436
U.S. at 691).  Similarly, supervisors are liable only for their
own unconstitutional actions, which occur when the supervisor
participates in a rights-violating incident or when the
supervisor acts with deliberate indifference to the possibility
that a subordinate's lack of supervision or training will cause a
violation of a constitutional right.  <u>Sanchez v. Pereira-
Castillo</u>, 590 F.3d 31, 49 (1st Cir. 2009).

"The Fourth Amendment protects against unreasonable searches
and seizures."  <u>Schubert v. City of Springfield</u>, 589 F.3d 496,
501 (1st Cir. 2006) (citing U.S. Const. Amend. IV).  "[A]

10

compelled intrusion into the body" for DNA testing constitutes a search for Fourth Amendment purposes.  See id. (internal quotation marks omitted).  Voluntary consent to a search, however, makes the search reasonable.  See Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973); United States v. Gonzalez, 609 F.3d 13, 18 n.1 (1st Cir. 2010); United States v. Vanvliet, 542 F.3d 259, 264 (1st Cir. 2008).  "A person is seized when the police restrain that person's liberty," which can be accomplished by physical force or by "a verbal 'show of authority' that would compel a reasonable person to comply."  United States v. Dubose, 579 F.3d 117, 121 (1st Cir. 2009).  "When police conduct rises to the level of an arrest it is a seizure that requires probable cause under the Warrant Clause of the Fourth Amendment."  Schubert, 589 F.3d at 501.  "The line between temporary detentions and de facto arrests is often blurred . . . [depending on] whether a police officer's initial action was justified and, if so, whether subsequent (more coercive) actions undertaken by the officer were justified by developing circumstances."  Morelli v. Webster, 552 F.3d 12, 19 (1st Cir. 2009).

In support of their motion for summary judgment, the defendants provide the affidavit of Lieutenant James Lima, who submits the standard operating procedures for the Nashua Police Department as appendices to his affidavit.  Lima explains the

training and instruction Nashua police officers were given for interviews of witnesses and victims of crimes.  The procedures provided do not support activity that would violate a witness's or a victim's constitutional rights.  Theresa provides no evidence that Nashua had any practice, policy, or procedure that would make Moushegian's allegedly unconstitutional conduct attributable to the city.  Therefore, the city is entitled to summary judgment on the claims in Counts I and IX.

The defendants also assert that Theresa lacks evidence of any action or inaction by the defendant supervisors or the chiefs of police that caused a violation of her constitutional rights. The supervisory defendants also provide their affidavits that to their knowledge no one violated Theresa's rights in the course of interviewing her on September 12, 2006.

In response, Theresa relies on the defendants' statement in their answer that "defendants admit that supervisors occasionally monitor police officers and detectives actions."  Ans. ¶ 102. She contends that the defendant supervisors are liable because they were occasionally in the building and either supported violations of her constitutional rights or failed to stop unconstitutional activities, failed to ensure that Theresa was released or escorted out of the building, and should have known that she was being illegally detained.

Even if Theresa could prove that Moushegian violated her Fourth Amendment rights, she has not provided evidence of supervisory liability.  Theresa notes that Moushegian said that he communicated with Sergeant McDannell in the Youth Services Division and another officer, who is not a defendant.  She asserts that Chief Hefferan was responsible for his subordinates. She also argues that Lieutenant Sprankle, an officer in the Youth Services Division, was involved in the investigation and, therefore, was deliberately indifferent to the treatment she was receiving.

Theresa falls far short of showing a disputed issue for trial.  Her claim against Chief Hefferan is based on a respondeat superior theory, which does not support liability under § 1983. The mere fact that McDannell, Sprankle, and Howe were involved in the investigation, were at the police department when Theresa was there, and received updates on the investigation does not demonstrate that they either participated in the actions that she contends violated her rights or that they knew of and were deliberately indifferent to violations of her rights.  To the contrary, they state in their affidavits that they did not interview Theresa and that they were not aware of any activity that constituted improperly detaining or interviewing Theresa.

Theresa's allegations without proof that the supervisory defendants as a group knew or should have known that she was being illegally detained and interviewed are insufficient to oppose the defendants' properly supported motion.   Further, Theresa relies on a respondeat superior theory that does not support liability under § 1983.   Therefore, the City of Nashua and the supervisory defendants are entitled to summary judgment on Counts I and IX.

B.   Count II - Fourth Amendment

Theresa contends in her second claim that Ciszek violated her Fourth Amendment rights by detaining her as a prisoner in the family's apartment during the early morning of September 12, 2006.   She further contends that the City of Nashua and the supervisory defendants also violated her Fourth Amendment rights based on Ciszek's actions.   The defendants assert that Theresa cannot prove her claims.

"The Fourth Amendment protects against unreasonable searches and seizures."   Schubert v. City of Springfield, 589 F.3d 496, 501 (1st Cir. 2006) (citing U.S. Const. Amend. IV).   "A person is seized when the police restrain that person's liberty," which can be accomplished by physical force or by "a verbal 'show of authority' that would compel a reasonable person to comply."

14

United States v. Dubose, 579 F.3d 117, 121 (1st Cir. 2009).
"When police conduct rises to the level of an arrest it is a
seizure that requires probable cause under the Warrant Clause of
the Fourth Amendment." Schubert, 589 F.3d at 501.  "The line
between temporary detentions and de facto arrests is often
blurred . . . [depending on] whether a police officer's initial
action was justified and, if so, whether subsequent (more
coercive) actions undertaken by the officer were justified by
developing circumstances." Morelli v. Webster, 552 F.3d 12, 19
(1st Cir. 2009).

        The record facts, including Theresa's allegations, establish
that Ciszek did not restrain Theresa in violation of her Fourth
Amendment rights.  In his affidavit, Ciszek states that he is a
detective with the Nashua Police Department and was working the
third shift on September 11 to 12, 2006.  He states that he
stayed in the apartment after Jessica, Jacob, Lwiza, and Severine
were taken to the police department in order to ensure that no
evidence was destroyed.  Ciszek says that during the night he
occasionally talked with Theresa about matters unrelated to the
investigation.  He also states that he did not restrict Theresa
within the apartment or tell her that she could not leave.
Before his shift ended, Theresa left, saying that she was going
to school, without any interference from Ciszek.

Because the record evidence establishes that Ciszek did not violate Theresa's Fourth Amendment rights, he is entitled to summary judgment on that claim.  In the absence of a constitutional violation, the City of Nashua and the supervisory defendants are also entitled to summary judgment.

## C.   Counts III and IV - First Amendment

Theresa contends that Moushegian dictated to her what to say in her recorded statement of sexual abuse by her father, which she further contends is a false statement.  She asserts that dictating her statement violated her First Amendment right not to have the government control her speech, Count III, and violated her First Amendment right to testify truthfully, Count IV.  The defendants contend that they are entitled to summary judgment because the First Amendment does not protect a witness's statements during a police interview in the circumstances of this case and because Theresa was allowed to testify to what she contends was the truth.

### 1.   Dictated Speech

Theresa bases her First Amendment right not to have Moushegian dictate her statement about sexual abuse on a quote from Ashcroft v. Free Speech Coalition, 535 U.S. 234, 245-46

(2002).  "As a general principle, the First Amendment bars the government from dictating what we see or read or speak or hear." Id.  Theresa argues that Moushegian dictated to her what to say in the recorded statement about sexual abuse by her father and in doing so violated the First Amendment.

For purposes of summary judgment, the defendants do not address the merits of Theresa's claim that Moushegian dictated to her what to say in the recorded statement, which is disputed. Instead, the defendants contend that the First Amendment does not provide a right not to have a statement dictated in the context of a police interview or interrogation.  The defendants argue that the Fourth, Fifth, and Fourteenth Amendments protect against coerced statements in the context of police questioning.  Because no cases support Theresa's creative application of the First Amendment, the defendants assert that Moushegian would be entitled to qualified immunity.

In Free Speech Coalition, which Theresa cites as support for her claim, the Supreme Court considered whether the Child Pornography Prevention Act of 1996 ("CPPA") violated the free speech clause of the First Amendment.  Id. at 239.  The sticking point was that the CPPA prohibited possessing and distributing images that did not use actual children.  The Free Speech Coalition objected to the reach of the CPPA to those who

17

possessed images that appeared to be, but were not, child pornography and who had not participated in pandering the images as child pornography.  Id. at 242-43.  Therefore, the question was whether virtual child pornography was unprotected speech. Id. at 246.  The Court concluded that the CPPA could not criminalize virtual child pornography without violating the First Amendment.  Id. at 256 & 258.

Despite the generalized statement of the First Amendment protection for speech, Free Speech Coalition does not support Theresa's claim.  Theresa cites no other case to show that a First Amendment right exists to protect a witness from being coerced to make a particular statement to police.

An officer is "entitled to qualified immunity unless (1) 'the facts that a plaintiff has alleged or shown make out a violation of a constitutional right' and (2) 'the right at issue was clearly established at the time of [his] alleged misconduct.'"  Giragosian v. Bettencourt, 614 F.3d 25, 29 (1st Cir. 2010) (quoting Pearson v. Callahan, 129 S. Ct. 808, 816 (2009)).  "A right is 'clearly established' if, at the time of the alleged violation, the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Id. (internal quotation marks omitted).

18

It is far from clear that Moushegian's actions, even if
Theresa could prove that he dictated her statement about abuse,
violated the First Amendment.  As Moushegian points out, however,
in the absence of clearly established law that dictating a
statement to a witness would violated her First Amendment rights,
Moushegian is entitled to qualified immunity.

### 2.   First Amendment Right to Testify

Theresa also contends in Count IV that Moushegian violated
her First Amendment right to testify truthfully by dictating a
false statement.  She argues that Moushegian forced her to make a
false statement, which was video taped and played at trial to
impeach her testimony.  She relies on Melton v. City of Oklahoma
City, 879 F.2d 706, 714 (10th Cir. 1989), and Smith v. Hightower,
693 F.2d 359, 368 (5th Cir. 1982), to support her First Amendment
right to testify truthfully.

The cases Theresa cites support the well-established right
to testify truthfully without being subjected to retaliation for
doing so.  Melton, 879 F.2d at 714-15 (holding that police
officer plaintiff had First Amendment right to testify on behalf
of criminal defendant despite police department's interest in
protecting confidential communications and efficiency of public
services); Smith, 693 F.2d at 368 (holding that First Amendment

19

protects right of police officers to testify in criminal proceedings); see also Cossette v. Poulin, 2006 WL 3751206, at *3 (D.N.H. Dec. 18, 2006) (citing cases).  In addition, the public has a duty to testify in aid of law enforcement.  See United States v. Winter, 70 F.3d 655, 660 (1st Cir. 1995).

Theresa did testify at her father's trial and told the story that she claims is the truth.  Although her testimony was impeached with the recording of her prior statement of sexual abuse by her father, she was not prevented from testifying.  In addition, she does not contend that she suffered retaliation based on the testimony she contends was truthful.

Therefore, Theresa has not demonstrated a violation of her First Amendment rights as she claims.

### 3.  Municipal and Supervisory Liability

To the extent Theresa states a First Amendment claim based on the right to be free from having a police officer dictate her statement, she has not provided any proof to support her claims of municipal and supervisory liability.  She merely refers to the support she offered for her supervisory liability claims in Count I, which was insufficient to support her claims.  Therefore the defendants are entitled to summary judgment on the municipal and supervisory liability claims in Counts III and IV.

D.   Count V - Fifth Amendment

In Count V, Theresa contends that Moushegian compelled her to be a witness against herself by recording her statement of sexual abuse, which she contends is false, that was later used to impeach her testimony during her father's criminal trial.   She cites Chavez v. Martinez, 538 U.S. 760, 766 (1994), in support of her theory.   Theresa misunderstands the right protected by the Fifth Amendment.

The Fifth Amendment protects an individual from being compelled to give evidence against herself or, stated in other terms, provides a privilege against forced self-incrimination. See, e.g., Maryland v. Shatzer, 130 S. Ct. 1213, 1228 (2010); Dickerson v. United States, 530 U.S. 428, 433-34 (2000); Kastigar v. United States, 406 U.S. 441, 444-45 (1972); United States v. Allee, 888 F.2d 208, 214 (1st Cir. 1989).   The Fifth Amendment privilege protects a witness from disclosures that the witness reasonably believes could be used against her in a criminal case. See Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County, 542 U.S. 177, 190-91 (2004); Chavez v. Martinez, 538 U.S. 760, 766-67 (1994).   For purposes of Fifth Amendment protection, a criminal case is the initiation of legal proceedings against the witness.   Chavez v. Martinez, 538 U.S. 760, 766-67 (2003).

Theresa's taped statement about sexual abuse implicated her father in criminal conduct but did not implicate her as a perpetrator of a crime.  Instead, Theresa was a victim. Therefore, the Fifth Amendment privilege does not apply to Theresa's taped statement.

Because Theresa's Fifth Amendment rights were not violated, Moushegian, the City of Nashua, and the supervisory defendants are entitled to summary judgment on Count V.

E.   Count VI, VII, X, XI, and XII – Eighth and Fourteenth Amendment Claims

In Count VI, Theresa alleges that Moushegian violated her rights under the Eighth and Fourteenth Amendments by failing to provide her with food during the time she spent at the police station on September 12.[7]  In Counts VII, X, XI, and XII, Theresa alleges that Moushegian violated her Fourteenth Amendment rights by subjecting her to threats and intimidation during the interview and by denying her requests that she be allowed to go to school, to work, and to a doctor's appointment.  Theresa

_____

[7]In her objection to the defendants' motion for summary judgment, Theresa argues that Ciszek also deprived her of food. Because her claim against Ciszek was not pleaded in her complaint, that new theory of liability is not considered for purposes of summary judgment.  See Steeves v. City of Rockland, 600 F. Supp. 2d 143, 179 (D. Me. 2009).

further contends that the City of Nashua and the supervisory defendants violated her constitutional rights based on the same events.

As the court explained in the order denying Theresa's motion for summary judgment, because Theresa was not a convicted inmate, the Eighth Amendment's prohibition against cruel and unusual punishments did not apply to her.  See Ruiz-Rosa v. Rullan, 485 F.3d 150, 155 (1st Cir. 2007).  In addition, her allegations do not implicate the Fourteenth Amendment's prohibition against punishment prior to adjudication of guilt, as would be applicable if she were being held as a pretrial detainee.  See, e.g., Mosher v. Nelson, 589 F.3d 488, 494, n.3 (1st Cir. 2009).  Because Theresa challenges the fairness of the officers' actions, her claims are construed to raise the substantive due process requirements of the Fourteenth Amendment.  See Gonzalez-Fuentes v. Molina, 607 F.3d 864, 880 (1st Cir. 2010).

Police actions are unconstitutional under the substantive due process requirements of the Fourteenth Amendment if they shock the conscience and also "violated a right otherwise protected by the substantive Due Process Clause."  Martinez v. Cui, 608 F.3d 54, 63-65 (1st Cir. 2010).  Whether police actions shock the conscience may depend in part on the context of the right violated.  Id.  For purposes of a claim of coercive

23

interrogation or unreasonable detention, only the most egregious
conduct will violate due process, such as police actions that are
intended to cause injury and are not justified by any legitimate
government interest.  <u>Chavez</u>, 538 U.S. at 774-75; <u>accord</u> <u>Kennedy</u>,
617 F.3d at 539-40.  To shock the conscience, the officer's
actions must violate personal rights with "an extreme lack of
proportionality" and be "inspired by malice or sadism rather than
a merely careless or unwise excess of zeal" to the extent "that
it amount to a brutal and inhumane abuse of official power
literally shocking to the conscience."  <u>Gonzalez-Fuentes v.</u>
<u>Molina</u>, 607 F.3d 864, 881 (1st Cir. 2010).

### 1.  <u>Food deprivation.</u>

Theresa faults Moushegian for failing to offer her food
during the interview.  The record establishes that Moushegian
spent approximately three hours with Theresa from 10:15 a.m.
until 1:00 p.m.  She does not claim that she asked Moushegian for
food.  She contends only that Moushegian failed to offer her
food.[8]  Under the circumstances, Moushegian's conduct in failing
to offer food does not shock the conscience.  Therefore,

---

[8]She does allege that two other officers refused her request
for food at 3:00 p.m.

Moushegian, the City of Nashua, and the supervisory defendants
are entitled to summary judgment on Count VI.

    2.   Actions during interview.

    The court must assume, for purposes of deciding the
defendants' motion for summary judgment on these claims, that
Moushegian would not let Theresa leave the police station while
he interviewed her and that he yelled, screamed, and banged the
table during the interview, as Theresa states in her affidavit.
Moushegian's interview with Theresa lasted from about 10:15 a.m.
until sometime before the videotaping of her statement began at
11:52 a.m.   Theresa states that Moushegian was calm during the
first fifteen minutes of the interview.   Therefore, the part of
the interview that Theresa contends was abusive lasted for a
about an hour, which is what Theresa states in her affidavit.

    In general, interrogations that include yelling and
screaming and even vulgar language and threats do not shock the
conscience as long as the officer's conduct was not arbitrary and
capricious or intended to inflict harm.   See, e.g., Tinker v.
Beasley, 429 F.3d 1324, 1328-29 (11th Cir. 2005) (police
misconduct that violates another constitutional right does not
necessarily meet substantive due process standard); Cunningham v.
City of Wenatchee, 345 F.3d 802, 811-12 (9th Cir. 2003)

(persistent questioning of daughters about sexual abuse despite their denials and including threats that they could not leave until they confirmed abuse were not so coercive as to violate substantive due process); Key v. Finks, 2010 WL 3515720 at *5 (E.D. Ark. Sept. 1, 2010) (questioning included vulgar language and threats); Smith v. Campbell, 545 F. Supp. 2d 1218, 1223 (N.D. Fla. 2008) (interrogation lasted for six or seven hours; officers denied witness medication and threatened she would not see her son or the victim unless she confessed).  Therefore, police conduct and even misconduct that include coercive techniques do not offend substantive due process absent particularly egregious circumstances.  Chavez, 538 U.S. at 774.

Moushegian's interrogation, as recounted by Theresa, does not violate substantive due process.  The interview was part of the police investigation into Jessica's charges that their father had repeatedly raped her.  The police had a substantial interest in gathering information from family members about Severine's conduct, including whether he had engaged in sexual activity with his other daughters, Lwiza and Theresa.  Issues of Jessica's safety and whether Severine would be charged with sexual assault depended on the outcome of the investigation.

In addition, Theresa acknowledges that Moushegian never touched her during the interview or attempted to hurt her

26

physically.  Instead, she describes the interview process as
"torture" because she was afraid.  Without physical injury or an
intent to cause injury, Moushegian's conduct, as described by
Theresa, does not rise to the level of shocking the conscience.
Alternatively, even if the conduct were considered conscience
shocking, the law was not clearly established in September of
2006, and qualified immunity would bar Moushegian's liability.
Therefore, Moushegian is entitled to summary judgment on
Theresa's claim in Count VII.

Even if a constitutional violation were found, Theresa has
not provided evidence of municipal or supervisory liability.
Therefore, the City of Nashua and the supervisory defendants are
also entitled to summary judgment.

3.  Requests to go to school, to work, and to a doctor's
appointment.

In Counts X, XI, and XII, Theresa contends that Moushegian
violated substantive due process by refusing her requests to be
allowed to go to school, to work, and to a doctor's appointment.
Although Theresa states in her affidavit that she asked
Moushegian to let her leave to go to school, to work, and to a
doctor's appointment, she has not provided any evidence to show

that she missed classes or work.  Her doctor's appointment,
apparently, was a routine physical that was rescheduled.

Theresa does not state or support a claim for violation of
substantive due process in Counts X, XI, and XII.  Therefore,
Moushegian, the City of Nashua, and the supervisory defendants
are entitled to summary judgment on those claims.


F.   Count VIII - Defamation

Theresa contends that Moushegian and Howe are liable for
libel, slander, and defamation for disclosing and distributing
the recorded statement she made about sexual abuse by her father,
which she claims is false.  She asserts her claim under the First
and Fourteenth Amendments.  She also contends that the City of
Nashua and the supervisory defendants are liable.  The defendants
move for summary judgment, arguing that defamation is not a
constitutional tort and that she cannot prove a state law
defamation claim because their actions were privileged.

Theresa's theory of a First Amendment violation is mistaken.
The First Amendment protects the public's right to free
expression and limits the scope of state law claims of libel,
slander, and defamation when the "statement involved either a
public official or a matter of public concern, or both."
Galarneau v. Merrill Lynch, Pierce, Fenner & Smith Inc., 504 F.3d

189, 199 (1st Cir. 2007).  Theresa has not cited a case that
supports a First Amendment right to be protected from
dissemination of false statements.

To the extent Theresa intended her defamation allegations to
support a substantive due process claim under the Fourteenth
Amendment, she has not developed that theory, and it is waived.
See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).
Further, the circumstances she alleges would not support a
substantive due process claim.

In her objection to summary judgment, Theresa addresses a
state law claim for libel, slander, or defamation.[9]  Under New
Hampshire law, to succeed, she would have to show "that the
defendant failed to exercise reasonable care in publishing a
false and defamatory statement of fact about the plaintiff to a
third party, assuming no valid privilege applies to the
communication."  Thomas v. Tel. Publ'g Co., 155 N.H. 314, 321
(2007).  "Privileged communications are generally divided into
two classes:  (1) those that are absolutely privileged; and (2)

---

[9]The complaint does not allege a state law cause of action
for defamation.  Arguably, Theresa cannot amend her complaint at
this late state of the litigation to include a new state law
claim.  Because the claim can be resolved easily on the record,
however, the court will address it as presented in Theresa's
objection.

those that are qualifiedly or conditionally privileged."  <u>Pierson v. Hubbard</u>, 147 N.H. 760, 763 (2002).

Absolute privilege protects the speaker from liability without regard to his motive, but a conditional privilege applies only when the communication was "published on a lawful occasion, in good faith, for a justifiable purpose, and with belief, founded on reasonable grounds, of its truth."  <u>Id.</u> at 764 (internal quotation marks omitted).  Courts have held that officers' statements to the media or the public about criminal investigations are entitled to absolute or qualified privilege, depending on the circumstances.  <u>See, e.g.</u>, <u>Gordon v. Beary</u>, 2008 WL 3258496 at *8 (M.D. Fla. Aug. 6, 2008).  For example, statements made by police officers in an arrest report are absolutely privileged while statements to the public or media are subject to a conditional privilege.  <u>Burke v. Town of Walpole</u>, 405 F.3d 65, 95 (1st Cir. 2005); <u>Zutz v. Kamrowski</u>, 787 N.W.2d 286, 292-93 (N.D. 2010).  In addition, a report to a prosecutor as part of a criminal investigation is entitled to absolute privilege.  <u>McGranahan v. Dahar</u>, 119 N.H. 758, 769-70 (1979).

Howe's report to the prosecutor about the investigation into charges of sexual abuse against Severine, which included Theresa's recorded statement of abuse by her father, is absolutely privileged.  Theresa provides no evidence that Howe

30

made a statement to the public or the media about the case, or more specifically, disclosed her statement.  To the extent Howe made a report to the public or the media about the case, in the absence of information about Theresa's statement, that communication does not implicate defamation.

In addition, if a statement were made, Howe would be entitled to a conditional privilege as long as he provided the information lawfully, reasonably believed the report was true, and provided the report in good faith.  Howe states in his affidavit that he believed that Theresa's statement was true. Although Theresa disputes the truth of her statement, nothing in the record suggests that Howe had reason to believe the statement was false, that he was not acting lawfully, or that he acted in bad faith.

Moushegian states in his affidavit that he provided his report and Theresa's recorded statement to his supervisor, Sergeant McDannell.  He further states that he did not distribute any information about the investigation to the public or the press.  Theresa does not provide any evidence that Moushegian distributed her statement to the public or the press.

Therefore, Howe and Moushegian are entitled to summary judgment on the state law defamation claim suggested in Theresa's objection to summary judgment.  Because Theresa lacks evidence

31

that any actionable defamation occurred, neither the city nor the supervisory defendants are liable.[10]

Conclusion

For the foregoing reasons, the defendants' motion for partial summary judgment (document no. 46) is granted.

The only claims remaining in this case are:

(1) Count I - Fourth Amendment claim against Michael Moushegian, alleging an unreasonable seizure based on the interview process, and

(2) Count IX - Fourth Amendment claim against Michael Moushegian, alleging an unreasonable search in obtaining a DNA sample.

The final pretrial conference is scheduled for 9:30 a.m. on Monday, November 22, 2010.  The trial is scheduled during the

---

[10]In the context of a state law tort, the city and supervisory defendants would be liable under vicarious liability only if Moushegian or Howe had committed tortious acts.  See Porter v. City of Manchester, 155 N.H. 149, 152 (2007).

period that begins on December 7, 2010, subject to any scheduled
criminal trials which will take precedence.

SO ORDERED.

Joseph A. DiClerico, Jr.
United States District Judge

November 10, 2010

cc:  Brian J.S. Cullen, Esquire
     Theresa Wamala, pro se

33