UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

<u>Theresa Wamala</u>

   v.                                        Civil No. 09-cv-304-JD
                                                         Opinion No. 2011 DNH 002

<u>Michael Moushegian</u>

<u>O R D E R</u>

     Theresa Wamala moves for reconsideration of the order issued on December 14, 2010, in which the court rejected a new theory that Wamala raised at the final pretrial conference and allowed the videotape of part of her interview with Detective Moushegian. Wamala objects that she was not afforded an opportunity to respond to Moushegian's memorandum, addressing Wamala's new theory that Moushegian is liable for her extended stay at the police station because he violated a Nashua Police Department standard operating procedure, which she claims requires officers to escort witnesses out of the station. Wamala filed an objection to Moushegian's memorandum with her motion for reconsideration.

     The court accepts Wamala's representation that she did not receive Moushegian's memorandum, filed on December 1, until December 6 and that she was preparing her response when the court issued the order on December 14. Therefore, the court will

reconsider its December 14 order, in light of Wamala's objection to Moushegian's memorandum and her motion for reconsideration.

I.  Procedure for Escorting Witnesses

Wamala alleges that Detective Moushegian violated her Fourth Amendment rights by keeping her at the police station, against her will, to question her about her father, Severine Wamala, and by forcing her to give a DNA sample.  She contends that Moushegian forced her to stay at the police station from 10:00 a.m. until 9:00 p.m. on September 12, 2006, by a coercive display of his authority and by refusing her requests to leave.  She also contends that after the interview, Moushegian left her in a small room and that she was not allowed to leave the police station until 9:00 p.m.

Moushegian represents that Wamala voluntarily complied with his request to come to the police station for an interview, voluntarily participated in the interview, and voluntarily gave a DNA sample.  He states that after Wamala arrived at the police station, he took her to an interview room.  He further represents that the interview ended just before 1:00 p.m. and that he returned Wamala to the waiting area where she was free to leave.

He states that he did not have any interaction with Wamala after he left her in the waiting area.[1]

In her motion for reconsideration, Wamala disputes the court's prior assumption that the parties agreed that Moushegian returned her to the waiting area. She contends that Moushegian did not return her to the waiting area but instead left her in another room in the police station. After reviewing the transcript of the final pretrial conference, the court agrees that there is a dispute as to where Moushegian left Wamala after the conclusion of the interview. That dispute remains to be resolved at trial.

At the final pretrial conference, Wamala raised a new theory that Moushegian was responsible for the extended time she spent at the station, after he left her in a room at the station, because a police department standard operating procedure requires an officer to escort a witness out of the station, which he did not do. Moushegian filed a memorandum on the issue. Neither Moushegian nor his counsel found a procedure resembling the one Wamala alleges. Wamala has not identified the specific procedure she alleges supports her theory.

---

[1] The police log indicates that Wamala was not signed out, however, until 6:25 p.m.

In support of her claims, Wamala asserts that Moushegian forced her to stay during the interview and afterwards by a coercive display of his authority, by refusing her requests to leave, and by leaving her in a room without escorting her out of the station. Wamala states that she will introduce Nashua Police Department standard operating procedures to show that Moushegian knew of his obligation to escort her out of the station and that in not complying with that procedure he demonstrated malicious and callous indifference to her rights. As a result, she argues, Moushegian "caused" her to stay at the station against her will and is responsible for the actions of others that allegedly violated her constitutional rights.

As a preliminary matter, Moushegian has asked Wamala to identify which procedure she contends supports her claim. She has failed to do so. Wamala also has not provided the alleged procedure or a reference to it in either her motion for reconsideration or her objection. Her failure to identify the specific operating procedure that she contends supports her claim creates obvious difficulties in trying to analyze the relevance of this particular claim.

If an "escort out" procedure existed, Moushegian's failure to comply does not support Wamala's theory that he is liable for her extended stay at the station. As the court explained in the

prior order, a violation of an "escort out" procedure, by itself, would not amount to a violation of the Fourth Amendment. Moushegian's failure to escort Wamala out of the station, once she was free to leave, does not establish that he forced her to stay against her will in violation of the Fourth Amendment. See, e.g., Hall v. Bates, 508 F.3d 854, 857-58 (7th Cir. 2007).

Relying on Gutierrez-Rodriquez v. Cartagena, 882 F.2d 553, 56-61 (1st Cir. 1989), Wamala asserts that the "escort out" procedure legally obligated Moushegian to take her out of the station and that by failing to do so, he caused her continuing detention in the station. As Moushegian points out, Wamala misquoted Gutierrez-Rodriquez by leaving out a critical phrase: "The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict constitutional injury." Id. at 561 (internal quotation marks omitted; emphasis added to mark the omitted section).

Assuming that such a procedure existed, Wamala has not shown that Moushegian was legally obligated to comply with it. Further, the indirect causation theory Wamala raises requires proof that Moushegian knew or reasonably should have known that his actions would cause others to inflict constitutional injury.

5

Wamala offers no argument or evidence to support that part of the analysis.  As such, Wamala has not shown how an "escort out" procedure is relevant to prove her Fourth Amendment claim in this case.

Alternatively, Wamala asserts that she intends to introduce the "escort out" procedures to show the knowledge Moushegian possessed when he left her in a room at the station instead of escorting her out.  She contends that the procedure shows that Moushegian was trained and that his failure to comply was not a mistake.  She also asserts that Moushegian's failure to comply with the alleged procedure shows his willful and callous indifference to her Fourth Amendment rights.  In the absence of the specific procedure Wamala relies on for her claim, the court is unable to determine its relevance.

Wamala further argues that by allowing the defendants to rely on their standard operating procedures to support their defenses for purposes of summary judgment, the court improperly would favor the defendants if she were not allowed to use the "escort out" procedure she now asserts.  Wamala misunderstands the nature of evidence.  Evidence must be relevant to be admissible at trial. Fed. R. Evid. 401.  The court's rulings on the admissibility of evidence are based on the Federal Rules of Evidence, not on an amorphous concept of fairness.

Before Wamala raises the "escort out" procedure at trial, in her opening statement, her testimony, or otherwise, she first must make a proffer to the court. In the proffer, Wamala must identify specifically the Nashua Police Department procedure she claims existed and explain the relevance of the procedure to her claims. Counsel for Moushegian will have an opportunity to respond. The court then will make a determination of the relevance and admissibility of the asserted procedure.

II. <u>Videotape of Part of the Interview</u>

Wamala contends that the videotape of part of her interview with Moushegian is inadmissible under Federal Rule of Evidence 403. She further contends the court failed to consider the most crucial point of the prejudicial effect of allowing Moushegian to introduce the videotape of part of her interview. She argues that because the first part of the interview was not recorded, it is unfairly prejudicial to allow the jury to see only the recorded part.

Rule 403 provides in pertinent part that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Because all relevant evidence tends to be prejudicial to the party against whom it is offered, the rule protects against only <u>unfair

prejudice.  See United States v. Gentles, 619 F.3d 75, 87 (1st Cir. 2010); United States v. Dowdell, 595 F.3d 50, 74 (1st Cir. 2010).  Therefore, in determining whether challenged evidence should be excluded, the court weighs the probative value of the evidence against the danger of unfair prejudice.  Id.

Moushegian interviewed Wamala by himself and without recording the interview beginning soon after 10:00 a.m. and continuing until before noon on September 12.  Moushegian then arranged for a victim advocate, Brenda Gibson, to join them and for the remainder of the interview to be video and audio taped.  The video and audio taped part of the interview lasted from 11:52 a.m. until 12:49 p.m.  There is no video or audio tape of the part of the interview that occurred before 11:52 a.m., and there are no witnesses to that part of the interview other than Moushegian and Wamala.

Wamala alleges that during the unrecorded part of the interview Moushegian yelled in her face and refused to let her leave when she asked to do so.  She contends that it is unfairly prejudicial to show the recorded portion where Moushegian is calm and Wamala does not ask to leave.  Wamala also asserts that the videotape will cause a distraction because the content of her statement about sexual abuse is not at issue in the case.  She asks the court to exclude the videotape and represents that in

its place, she will stipulate that the videotape exists and what it shows.

The videotape shows Moushegian sitting across a small table from Wamala in an interview room. Brenda Gibson, the victim advocate, is sitting at the end of the table. Moushegian is very calm in his questioning. Wamala appears to be subdued and quiet. Wamala answers Moushegian's questions about her family, her relationship with family members in Uganda, her move to New Hampshire, her father's sexual relations with her, and her father's sexual relations with her sisters.

Toward the end of the interview session, Moushegian asks Wamala to provide a DNA sample. Wamala asks if the DNA sample would tell whether Severine Wamala was her father. Moushegian explains that it would depend on what tests were done on the sample and that he did not think they would do a paternity test. Wamala asks if he knew what tests would be done and whether she would get the results of the tests. Wamala agrees to provide a DNA sample, signs the form, and wipes the swab inside her cheek. Wamala then asks about her father and about the consequences of what he had done.

The videotape shows Moushegian's and Wamala's demeanor and actions during that part of the interview, demonstrating that both Wamala and Moushegian were calm, that Wamala voluntarily

answered his questions, that she did not ask to leave, and that she voluntarily gave her DNA sample. As such, it is highly probative of facts at issue in this case.

Because the videotape is probative evidence that supports Moushegian's version of what happened, it is necessarily prejudicial to Wamala's claims. It is not <u>unfairly</u> prejudicial, however. Wamala will have the opportunity to testify at trial about what happened during the unrecorded part of the interview. She also can examine Moushegian about the first part of the interview, about his decision not to record the first part, and about his decision not to include a victim advocate during that part. Although testimony about the first part of the interview may not be as effective as the videotape, that discrepancy does not outweigh the probative value of the videotape.

Wamala also argues that the subject matter of her statement is likely to distract the jury. The jury will be informed about the subject matter of the interview in order to provide a context for Wamala's claims. Although her statement includes graphic details about the abuse she suffered, the statement is not collateral to her case nor is it so disturbing as to undermine its probative value. <u>See, e.g.</u>, <u>United States v. Diaz</u>, 597 F.3d 56, 65-66 (1st Cir. 2010); <u>United States v. DeCologero</u>, 530 F.3d 36, 60 (1st Cir. 2010).

Therefore, the probative value of the videotape outweighs any danger of unfair prejudice. The videotape can be shown at trial.

## Conclusion

For the foregoing reasons, the plaintiff's motion for reconsideration (document no. 94) is granted to the extent that the court has considered the plaintiff's objection (document no. 95) and will make a determination of the relevance of a Nashua Police Department "escort out" procedure at trial following the plaintiff's proffer on the issue. The motion is otherwise denied.

SO ORDERED.

/s/ Joseph A. DiClerico, Jr.
Joseph A. DiClerico, Jr.
United States District Judge

January 3, 2011

cc:  Brian J.S. Cullen, Esquire
     Theresa Wamala, pro se